**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MARINA SCARR,**

    **Plaintiff,**

**v.**                                               **Case No. 8:06-cv-566-T-30MAP**

**UNUM LIFE INSURANCE COMPANY**
**OF AMERICA,**

    **Defendant.**
_____/

# AMENDED ORDER[1]

THIS CAUSE comes before the Court upon Defendant's Motion for Final Judgment or, in the Alternative, Final Summary Judgment (Dkt. #23), Plaintiff's Response in opposition to the same (Dkt. ##29), and Defendant's Reply to Plaintiff's Response (Dkt. #35). After carefully considering the parties' submissions, the Court determines that Defendant, Unum Life Insurance Company of America (**"Unum"**), is entitled to judgment as a matter of law on Plaintiff Marina Scarr's (**"Plaintiff"**) claims.

## BACKGROUND AND CLAIMS

This is a civil enforcement action arising under the Employee Retirement Income Security Act of 1974 (**"ERISA"**) § 502, Title 29 U.S.C. §1001, *et seq*. Defendant properly removed the action to this Court on April 24, 2006. Plaintiff alleges that Defendant wrongfully terminated her benefits claim under a group long-term disability insurance policy

---

[1] Typographical errors in two case cites were corrected.

bearing number 296835 (the **"Policy"**).  AR-UACL00280[2].  Defendant issued the Policy, which is governed by ERISA, to Plaintiff's former employer, Shear, Newman, Hahn, & Rosenkranz, P.A. (**"Shear Newman"**) on February 1, 1995.  Id.

## I. Plaintiff's Initial Claim[3].

Plaintiff was employed by Shear Newman as a legal secretary from September 11, 1989, to January 3, 2000.  AR-UACL00013.  Following her departure from the firm, Plaintiff submitted a claim for benefits under the Policy.  According to her claim form, which she filed on May 11, 2000, Plaintiff was "overwhelmed with stress and overworked" following: (i) the death of her father in April of 1999, (ii) the termination of a six year relationship in June of 1999, and (iii) the departure of her boss of ten years from the firm in August of 1999.  AR-UACL00024.  Plaintiff also reported being sexually harassed by a Shear Newman attorney, and indicated that she had become "extremely suicidal."  Id.

Plaintiff's treating physician, Dr. M. K. El-Yousef, completed a medical certification form on April 24, 2000.  AR-UACL00022.  Dr. El-Yousef, who began treating Plaintiff in July of 1999, diagnosed Plaintiff with "major depression," and noted symptoms including severe depression, insomnia, anxiety, psychomotor retardation, withdrawal, and crying spells. Id.  The certification form included information about the patient's ability to work.  In

---

[2] Citations to the Administrative Record located at Dkt. #22 are identified herein by Bates-stamp page number.

[3] As Plaintiff has provided no opposition to Defendant's version of the undisputed material facts or the Administrative Record, the Court will adopt those undisputed facts as set forth in Defendant's Motion for Final Judgment (Dkt. #23) and the Administrative Record (Dkt. #22).

response to a question regarding "Restrictions," defined as "what the patient should not do," Dr. El-Yousef responded that Plaintiff was "unable to work." Id. Furthermore, as to a question regarding "Limitations," defined as "what the patient cannot do," Dr. El-Yousef responded that Plaintiff was "unable to relate to other people socially." Id. Dr. El-Yousef did not provide any further information at this time regarding restrictions or limitations.

Upon receipt of Plaintiff's forms and medical certification, Defendant began its investigation of Plaintiff's claim. Following a 90-day elimination period under the policy in which no claims were payable, Defendant began paying disability benefits to Plaintiff under a reservation of rights on July 20, 2000. Defendant paid Plaintiff full benefits from April 3, 2000, through August 2, 2000.[4] AR-UACL00045-00049.

Upon Defendant's request, Dr. El-Yousef provided Defendant with Plaintiff's treatment records, which were referred to its psychiatric unit for peer review. Defendant's clinical consultants noted a number of factors in Dr. El-Yousef's records which ultimately led to the decision to terminate of Plaintiff's claim. First, Plaintiff did not attend a psychotherapy session during the two months prior to her departure from Shear Newman. AR-UACL00037-00038. Prior to this time period, Plaintiff had been attending monthly treatment sessions. Next, Defendant's clinical consultants noted that Plaintiff's situational depression began improving upon her departure from the law firm. Defendant points out the following statements made by Plaintiff to Dr. El-Yousef: (i) on January 1, 2000, she reported being "much less depressed," (ii) on March 2, 2000, she stated "I am feeling better . . . have

---

[4] Plaintiff does not dispute that benefits were paid for this limited time period. See Dkt. 37(2).

had one bad day," and shared that she had not taken Xanax for a week and was roller skating daily, (iii) on May 18, 2000, she reported having more good weeks than bad and that the depression was at worst modest, (iv) on June 20, 2000, she reported being "able to have fun," and that she was "doing okay unless alone." AR-UACL00031-00037.

On July 20, 2000, Defendant sent correspondence to Plaintiff and Dr. El-Yousef requesting additional medical records. AR-UACL00047-00048. Specifically, Defendant requested "all treatment notes" and "medical records," including Plaintiff's treatment records prior to 1999. Id. Defendant claims that Dr. El-Yousef never responded to its requests and that it made its final decision without the benefit of a response.

In a letter to Plaintiff dated October 9, 2000, Defendant indicated that Plaintiff's claim for long term disability benefits had been denied. AR-UACL00055. The letter indicated that, upon review of her file, Defendant's on-site doctor could find "no objective evidence of restrictions and limitations preventing [Plaintiff] from returning to work." Id. Defendant's doctor noted that Plaintiff was not receiving regular treatment in the months leading up to her departure from the law firm, and that there was continuous improvement in her condition following her departure. Id. Furthermore, Defendant's doctor noted that "the therapist notes indicate that [Plaintiff's] condition appeared to be based on situational factors rather than an actual global impairment." Id. Plaintiff was given the opportunity to submit additional information for further consideration of her claim. Id.

Defendant retained counsel to appeal the denial of her claim. On January 2, 2001, Defendant's counsel filed a civil remedy notice with the Florida Department of Insurance and

provided Defendant with an updated narrative report from Dr. El-Yousef. AR-UACL00060-00065. In his report, dated December 1, 2000, Dr. El-Yousef described Plaintiff's disability as "essentially totally disabling" depression, which continued to be "severe, disabling and uncontrollable with some suicidality." Id. The letter indicated that Plaintiff had only marginally responded to medication, and that she was currently receiving psychotherapy on a monthly basis. Id. Furthermore, the letter summarized Plaintiff's history of depression, dating back to 1975. Id. Dr. El-Yousef concluded his letter with the following statement: "[I]t is my clinical opinion that Ms. Scarr has been continuously disabled since she started seeing me, July 22, 1999, and it is severe enough and disabling enough that she is unable to do any work and she is totally disabled by it." Id. Dr. El-Yousef also indicated that, due to concerns regarding Plaintiff's suicidal state, he was referring her to Dr. Michael Sheehan for a second opinion.

Plaintiff's appeal was reviewed by Dr. David Goldsmith, a consulting psychologist for Defendant. Dr. Goldsmith reviewed Plaintiff's mental health records provided by Dr. El-Yousef, which began with a July 26, 1999 session. AR-UACL00081-00084. The records provided did not include Plaintiff's initial psychiatric assessment, which occurred prior to July 26, 1999. Dr. Goldsmith claims he attempted to call Dr. El-Yousef on January 30, 2001 to obtain the initial psychiatric assessment. Dr. Goldsmith claims he placed another follow up call to Dr. El-Yousef on February 8, 2001, and then followed up with a letter requesting Dr. El-Yousef's input regarding Plaintiff's clinical status. AR-UACL00081. Defendant claims that Dr. El-Yousef did not reply to these requests.

In a letter directed to Plaintiff's counsel, dated February 14, 2001, Defendant discussed its unsuccessful attempts to contact Dr. El-Yousef. Defendant indicated that a decision would be made without the benefit of additional input if no response was received by February 23, 2001. On February 22, 2001, Dr. El-Yousef replied to the letter, denied ever being contacted by Defendant, and indicated he was more than happy to provide any information upon written request. AR-UACL00091. Defendant responded by providing Dr. El-Yousef with a copy of Dr. Goldsmith's original letter and requested that he contact Dr. Goldsmith to discuss the Plaintiff's claims. Defendant claims Dr. El-Yousef never responded to this request.

Notwithstanding Dr. El-Yousef's December 1, 2000 report, Defendant upheld the denial of Plaintiff's benefits. AR-UACL00095-00097. A letter from Defendant to Plaintiff dated March 9, 2001, explained the decision and indicated that according to Dr. Goldsmith, without "additional clinical evidence . . . it is quite evident that the claim file does not present ample, consistent, reliable and verifiable clinical evidence that manifestations of a mental disorder, of sufficient type and severity, impose occupation impairment that prevents the Claimant [Ms. Scarr] from performing occupational duties." AR-UACL00096. Defendant claims it heard nothing further from Plaintiff or her attorney until Plaintiff's claim was reassessed, as discussed further below.

**II.     Reassessment of Plaintiff's Claim.**

As a result of an investigation into Defendant's claims handling practices, Defendant and other subsidiaries of UnumProvident Corporation (**"UPC"**) entered into a multi-state regulatory settlement agreement[5] with a number of state insurance regulators and the United States Department of Labor (the **"Regulatory Settlement Agreement"**).  Pursuant to the Regulatory Settlement Agreement, a "Claim Reassessment Process" was established by UPC and its subsidiaries.  The Claim Reassessment Process provided an identified class of claimants the opportunity to pursue a *de novo* review of their claims.  The Claim Reassessment Process required UPC and its subsidiaries to consider both past and present information and utilize improved claim handling procedures in order to fairly remedy past deficiencies.

Plaintiff submitted a Reassessment Information Form (**"RIF"**) to Defendant on August 29, 2005, in conjunction with the Claim Reassessment Process. UACL00115.  In the RIF, Plaintiff indicated that she began working as a comptroller on December 17, 2001. AR-UACL00113-115.  Furthermore, Plaintiff claimed that she was "completely unable to work from January 3, 2000, until December 17, 2001," and that Defendant had denied her prior claim "for no valid reason."  AR-UACL00114.

---

[5] As Defendant has not objected to the unsigned copy of the Regulatory Settlement Agreement attached as Exhibit A to Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt. #29-2), the Court assumes for the purposes of this Order that the document filed accurately represents the final agreement of the parties referenced therein.

Defendant assigned a new nursing consultant and clinical psychiatrist, Dr. Peter Brown, to review Plaintiff's records in connection with the reassessment. Dr. Brown was able to obtain all additional information requested from Dr. El-Yousef, including Plaintiff's initial psychiatric evaluation which had not been provided with Plaintiff's initial claim. AR-UACL00193-00199. In reviewing Dr. El-Yousef's treatment records, Dr. Brown noted the following: (i) the "assertion that Plaintiff was severely depressed and unable to work from 7/26/99 is contradicted by the clinical records and by the fact she continued to work through the end of 1999," (ii) by April 18, 2000, Plaintiff was "still struggling with depression," (iii) by April 24, 2000, Plaintiff "reported progressive early improvement since stopping her antidepressant medication," (iv) from May 1, 2000 through August 21, 2000, "this improvement persisted and she reported being able to enjoy herself in activities and in her relationships and was looking forward to trips to Africa and Europe," (v) on October 30, 2000, Plaintiff was very upset following the denial of her benefits claim by Defendant, and "improvement was still marginal at best," (vi) on November 30, 2000, Plaintiff complained of marked depression and new medications were added, (vii) On January 18, 2001, Plaintiff reported "no symptoms of depression or mania" after becoming involved in a new relationship, (viii) on February 22, 2001, Plaintiff reported no depressive symptoms for three weeks, and (ix) on June 4, 2001, Plaintiff reported that she felt "clearheaded," and that her "mental acuity" was back. AR-UACL00193-00199. A separate summary of Dr. El-Yousef's notes contained in the record notes the following: "[October 30, 2000] - daily stressors are major traumas of major impact. Impression: pt's improvement is still marginal at best and

still unable to work in a capacity she did pre-morbidly," and "[November 30, 2000] - reports continuing mood fluctuations. Agitated, dysphoric times and withdrawn depressions. Unable to read, buy groceries . . . [February 22, 2001] - has been manic . . . has had obvious cycles with recurrence of mania." AR-UACL00193.

As discussed, Dr. El-Yousef referred Plaintiff to Dr. Sheehan for a second opinion due to concerns regarding her suicidality. Dr. Sheehan submitted records to Defendant relating to two sessions with Plaintiff. The copies of Dr. Sheehan's records submitted to the Court are not legible. AR-UACL00180-00182. However Dr. Brown's notes indicate that during Plaintiff's first session on February 1, 2001, Dr. Sheehan confirmed her diagnosis of bipolar disorder and described her mental status as "appropriate, relaxed with goal directed thinking and no evident symptoms apart from episodic depression." Id. Dr. Brown's notes further indicate that Plaintiff's condition was noted as improved during her second session with Dr. Sheehan on February 17, 2001. Id.

Based on his review of the file, Dr. Brown concluded "to a reasonable degree of medical certainty" as follows:

> i) [W]hile the claimant has a chronic psychiatric condition that requires ongoing treatment and there is reasonable support for restrictions and limitations between [January 4, 2000] and [April 24, 2000], there is clear evidence of progressive improvement from [February 17, 2000] forward, and the records subsequent to [April 24, 2000] clearly indicate persistent sustained improvement (e.g. the ability to start and enjoy new relationships and the capacity to look forward to travel outside of the country), and an absence of significant mental status findings until [October 30, 2000] (i.e. the reported exacerbation of symptoms occurred only immediately after disability benefits were denied).

> ii) In light of the absence of reasonable evidence for occupationally precluding sustained significant restrictions or limitations, the clear evidence of job specific conflict (i.e. sexual harassment charges) is the most plausible explanation for her failure to return to work with her previous employer.

AR-UACL00201.  Based on Dr. Brown's assessment, Defendant upheld its denial of Plaintiff's claim, as set forth in a letter to Plaintiff dated October 28, 2005.  AR-UACL00202-00204.  As a result, Plaintiff filed this lawsuit.

## DISCUSSION

**I.     Summary Judgment Standard of Review.**

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995).  At the summary judgment stage, the judge's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, the court views all evidence in the light most favorable to the party opposing the motion.  Harris v. H & W Contracting Co., 102 F.3d 516, 519 (11th Cir. 1996).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists.

See Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993). The nonmoving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Celotex, 477 U.S. at 324.

## II.    ERISA Standard of Review.[6]

Section 1132 (a)(1)(B) of ERISA provides that a plan participant or beneficiary may bring a civil action in district court "to recover benefits due to him under the terms of his plan." ERISA, however, does not specify the standard to be applied when reviewing a claims administrator's decision to deny benefits. To fill this gap, in Firestone Tire & Rubber Co. v. Brunch, 489 U.S. 101, 115 (1989), the Supreme Court held: "a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

Subsequent to and consistent with the Supreme Court's decision in Firestone, the Eleventh Circuit set forth three standards of review that a court may apply in reviewing a plan administrator's claims decisions: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997). A heightened standard

---

[6] As additional evidence beyond the administrative record is rarely taken in ERISA cases, the usual tests for summary judgment, such as whether genuine issues of material fact exist, do not apply. See Providence v. Hartford Life and Accident Insurance Company, 357 F. Supp.2d 1341, 1342 (M.D. Fla. 2005).

of review is appropriate in cases where an insurer is also the claims fiduciary entrusted with determining the eligibility benefits under an ERISA plan. Payne v. Ryder System, Inc. Long Term Disability Plan, 173 F.R.D. 537, 542 (M.D. Fla. 1997). Even under this heightened standard of review, summary judgment is appropriate where there is no evidence of bias and no evidence of abuse of discretion. Id.

As set forth in Williams v. Bellsouth Tellocommunications, Inc., 373 F.3d 1132, 1138 (11th Cir. 2004), the Court must follow a multi-step approach to determine which standard of review it should apply. This multi-step approach, which was adopted for use "in reviewing virtually *all* ERISA-plan benefit denials," is as follows:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing the claims; if not, end the inquiry and affirm the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply the heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. Under the heightened arbitrary and capricious standard of review, when a conflict of interest exists, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest. HCA Health Services of Georgia, Inc. V. Employers Health Ins. Co., 240 F.3d 982, 994 (11th Cir. 2001). The claims administrator can satisfy this burden by showing that its wrong but unreasonable interpretation benefits the class of participants and beneficiaries. Id. However, the claimant may still be successful if he or she can demonstrate by other measures that the claim administrator's decision was arbitrary and capricious. Id.

### III.     Legal Analysis.

As set forth in Williams, the Court will first apply the *de novo* standard to determine whether Defendant's denial of Plaintiff's benefits was "wrong" (i.e., the Court disagrees with the administrator's decision), regardless of whether arbitrary and capricious review or the heightened arbitrary and capricious review applies. Williams, 373 F.3d at 1138. The Eleventh Circuit has held that a plaintiff suing to recover benefits or enforce rights under ERISA bears the burden of proving his or her entitlement to benefits. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998). Pursuant to the terms of the Policy, Plaintiff must prove that she was "disabled due to sickness or injury," and that she required "the regular attendance of a physician" in order to be entitled to long term disability benefits. AR-UACL00271. With respect to "Class 2" employees such as Plaintiff, the Policy defines "disabled" as follows:

> "Disability" and "disabled" mean that because of injury or sickness:

    1.    the insured cannot perform each of the material duties of his regular occupation; and

    2.    after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience; or

    3.    the insured, while unable to perform all of the material duties of his regular occupation on a full time basis, is:

        a.    performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

        b.    earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

AR-UACL00271. Furthermore, Section I, Part 12 if the Policy, entitled "Discretionary Authority," provides in pertinent part:

> In making any benefits determination under this summary of benefits, the Company[7] shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this summary of benefits.

AR-UACL00276. Thus, Policy expressly states that Defendant has complete discretion to construe or interpret the terms of the Policy and to determine eligibility for benefits.

Plaintiff was paid disability benefits under the Policy through August 2, 2000. Defendant's denial of benefits following this date was based on its review of medical records provided by Dr. El-Yousef. In reviewing these records, Dr. Brown noted progressive improvement in Plaintiff's condition from February 17, 2000, forward. Although there was

---

[7] The Policy defines "Company" as "UNUM Life Insurance Company of America."

a noted spike in Plaintiff's depression in October and November of 2000, Dr. Brown determined that this was temporary in nature and directly related to Plaintiff's initial claim being denied. This opinion is supported by the fact that Plaintiff's condition began to improve in January of 2001. Furthermore, for the relevant time period subsequent to August 2, 2000, Dr. Brown noted an absence of reasonable evidence for "occupationally precluding sustained significant restrictions or limitations." AR-UACL0020.

Based on its review of the Administrative Record, the Court cannot conclude that Defendant's denial of benefits was "wrong" under step one of the multi-step approach set forth in <u>Williams</u>. 373. F.3d at 1138. Accordingly, pursuant to <u>Williams</u>, no further inquiry is necessary and Defendant's decision should be affirmed.

It is therefore ORDERED AND ADJUDGED that:

1. Defendant's Motion for Final Summary Judgment (Dkt. #23) is **GRANTED**.

2. All pending motions are denied as moot.

3. The Clerk is directed to close this file.

**DONE** and **ORDERED** in Tampa, Florida on July 12, 2007.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2006\06-cv-566.msj.frm